UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at PIKEVILLE

CIVIL ACTION NO. 7:11 -122-EBA

CHARLES RUSSELL HOCKER,                                                             PLAINTIFF,

V.                          **MEMORANDUM**
                               **OPINION & ORDER**

PIKEVILLE CITY POLICE
DEPARTMENT, ET AL.,                                                       DEFENDANTS.

\* \* \* \* \* \* \* \* \*

This matter is before the Court on the Defendants' Motion for Summary Judgment. [Record No. 23]. Plaintiff Charles Russell Hocker, ("Hocker"), alleges a cause of action under 42 U.S.C § 1983 against Defendant Officer Addison Baisden, ("Baisden"), and Defendant Officer Chadwick Branham, ("Branham"), in their individual and official capacities as officers of the Pikeville City Police Department for the unreasonable use of deadly force in violation of Hocker's Fourth and Eighth Amendment rights. [Record No. 1, at ¶¶ 28-31]. Hocker also asserts that the City of Pikeville and the Pikeville City Police Department are liable under § 1983 based on a theory of Respondeat Superior. [Record No. 1, ¶¶ 47-51]. Hocker alleges additional claims under state law for assault, battery, negligence, and negligent infliction of emotional distress, as well as a claim for punitive damages. [Record No. 1, at 8-14]. The Defendants moved for summary judgment as to all Defendants on all counts in the complaint. [Record No. 23]. The matter having been fully briefed is now ripe for review. For the reasons explained below, summary judgment will be granted as to the claims under 42 U.S.C. § 1983, including those

alleged under Respondeat Superior, and the rest of Hocker's claims will be dismissed as there is no longer a basis for federal jurisdiction.

## I. FACTUAL & PROCEDURAL HISTORY

Around 10:15 p.m. on the night of August 13, 2010, Officers Baisden and Branham responded to a call that Hocker was outside Jessica Batten's, ("Batten"), apartment trying to break inside in violation of the Emergency Protective Order Batten had previously taken out against him. [Record Nos. 23-1, at 2-4; 42, at 2]. The call also indicated that Hocker was intoxicated and possibly suicidal. [Record Nos. 23-1, at 2-4; 42, at 2]. On their way to Batten's apartment, the officers observed Hocker driving in the opposite direction at a high rate of speed with his headlights off. [Record Nos. 23-1, at 4-5; 42, at 2]. The officers then began following Hocker, with their lights and sirens on. [Record No. 23-1, at 5, 15]. The officers followed Hocker as he turned onto Hurricane Creek Road and pulled onto a gravel road, where he stopped his car. [Record Nos. 23-1, at 5; 42, at 2]. When Hocker stopped, Officer Baisden parked about twenty-nine (29) feet behind Hocker's vehicle and Officer Branham parked to Officer Baisden's right. [Record No. 23-1, at 5]. Both officers turned off their sirens and exited their vehicles, with their lights still on. [Record No. 23-1, at 5-6]. Officer Baisden then posted up behind the driver's door of his cruiser, drew his weapon, and ordered Hocker to turn off his car, put his hands up, and exit his vehicle. [Record No. 23-1, at 6]. Hocker claims not to have heard Officer Baisden's order or noticed the flashing lights on the cruisers. [Record No. 23-1, at 15]. Officer Branham posted up behind Officer Baisden's cruiser on the driver's side. [Record No. 23-1, at 6; 42, at 4]. Hocker then put his car in reverse and accelerated, striking Officer Baisden's cruiser. [Record Nos. 23-1, at 6; 42, at 7-8]. Officer Branham was able to avoid impact by placing his arm on the back of the cruiser and pushing himself to the side of the vehicle. [Record Nos. 23-1, at 7; 42, at 4]. Officer

Branham then moved to the left of the vehicle, and lost sight of Officer Baisden. [Record Nos. 23-1, at 7-8; 42, at 4]. Officer Branham then began firing at the driver's side of Hocker's vehicle, firing a total of eight (8) shots. [Record Nos. 23-1, at 7-8; 42, at 4, 7]. The impact caused the driver's door to swing back and hit Officer Baisden's left arm, trapping him between the door and the cruiser. [Record Nos. 23-1, at 6; 42, at 4]. Officer Baisden was able to get himself free from between the door and cruiser and then fired a total of twelve (12) rounds at the driver's side of Hocker's vehicle. [Record Nos. 23-1, at 8; 42, at 4, 7]. Hocker continued in reverse, pushing the cruiser a total of thirty-four (34) feet before it came to a stop. [Record No. 23-1, at 7]. The impact tore the front bumper off Officer Baisden's cruiser and caused $3,852.58 in damage to the cruiser. [Record No. 23-1, at 7].

After the vehicles came to a stop, the officers shouted at Hocker, ordering him to exit his vehicle. [Record No. 23-1, at 10]. While Hocker only vaguely remembers the officers opening his car door and grabbing him, the officers testified they had to forcefully pull Hocker out of his vehicle by his arms because Hocker ignored their commands, was screaming, and holding onto the steering wheel. [Record Nos. 23-1, at 10; 42, at 14]. The officers assert that they only came to know Hocker had been shot by their gun fire when they opened the car door. [Record No. 23-1, at 10]. Once they were able to get Hocker out of his vehicle, Officer Branham handcuffed him in the front and "provided medical attention by holding Hocker's head in his right hand, tilting it back, and telling him to breathe."[1] [Record No. 23-1, at 10]. Officer Baisden radioed for

---

[1] Hocker claims that he was found at the scene "lying on the ground, handcuffed, and bleeding profusely," implying that the officers did not provide medical treatment. [Record No. 42, at 2]. However, the Police CAD report cited to by Hocker does not support that Hocker was found lying on the ground or any other indications that the officers did not provide medical treatment. [*See* Record No. 42-1, at 4-7]. Therefore, the officers' testimony that they provided medical treatment is accepted as true. See Frodge v. City of Newport, Civil Action No. 09-59-WOB, Record No. 34, at 14 n.2 (E.D.Ky. Dec. 29, 2010) [hereinafter "Frodge I"] ("Additionally, neither [plaintiff] contradict[s] the officer's testimony that they shouted at the men to stop fighting, only that they did not hear anything, and therefore, the officers' testimony that they did shout is accepted as true." (citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990))).

3

Emergency Medical Services, ("EMS"), to be sent to the scene. [Record No. 42-1, at 5]. Pikeville City EMS arrived and provided medical treatment to Hocker. The Pikeville City EMS transported him to Pikeville Medical Center, where he was stabilized before being taken to St. Mary's Hospital in West Virginia. [Record No. 23-1, at 13]. Hocker was hit by a total of nine (9) shots and testified that he does not remember anything from immediately after the shooting until he woke up in the hospital in West Virginia. [Record No. 42, at 13-14]. He also claims to have woken up with bruises on his neck, one (1) of which was in the shape of a handprint. [Record No. 42, at 14].

In the subsequent investigation by Kentucky State Police, ("KSP"), several witnesses told Detective Jason Merlo, ("Merlo"), that they saw flashing lights, heard shouts from the officers, screeching tires, and gun shots. [Record No. 23-1, at 6, 11-12]. An additional witness, Diane Meade, ("Meade"), testified that she saw the officers punch and hit Hocker while he was in his vehicle. [Record No. 42, at 5]. Detective Merlo conducted an investigation at the scene and concluded that the officers had "complied with [Pikeville City Police] Department policy regarding pursuit driving and the use of deadly force, as well as their policy and training received at the Department of Criminal Justice Training Academy." [Record No. 23-1, at 13].

Hocker disputes the conclusion of Detective Merlo's report based on what he asserts was an inadequate investigation. [Record No. 42, at 5-13]. In addition to claiming that the officers never received training on the use of deadly force, Hocker asserts that Detective Merlo inappropriately ignored Diane Meade's statement and destroyed evidence. [Record No. 42, at 5-7, 18]. Further, an expert employed by Hocker concluded after a review of the evidence that the use of deadly force was inappropriate and in violation of Kentucky law. [Record No. 42, at 16-17].

Following the incident on August 13, 2010, Hocker was indicted by a Pike County, Kentucky Circuit Court grand jury for two (2) counts of attempted murder, one (1) count of fleeing or evading police in the first degree, one (1) count of operating a motor vehicle while intoxicated, and one (1) count of persistent felony offender in the first degree. [Record No. 23-2, at 1-2]. Hocker subsequently pled guilty to two (2) counts of wanton endangerment in the first degree, one (1) count of fleeing and evading police in the first degree, and one (1) count of driving under the influence. [Record No. 23-2, at 3-7]. On November 30, 2011, Hocker was sentenced to a total of ten (10) years imprisonment. [Record No. 23-2, at 3-5]. A grand jury found Officers Baisden and Branham engaged in no criminal conduct on the night of August 13, 2010. [Record No. 23-1, at 14].

Hocker initiated the current action in federal court on August 4, 2011. [Record No. 1]. The complaint alleges claims against Officers Baisden and Branham in their individual and official capacities under 42 U.S.C. § 1983 for violation of Hocker's Fourth and Eighth Amendment rights, assault, battery, and negligent infliction of emotional distress. [Record No. 1]. The complaint further asserts claims against Pikeville City Police Department and the City of Pikeville under 42 U.S.C. § 1983 under a Respondeat Superior theory, as well as a claim against Pikeville City Police Department for negligent training and supervision of Officers Baisden and Branham. [Record No. 1]. Hocker additionally asserts a claim for punitive damages against all Defendants. [Record No. 1]. The Defendants filed for summary judgment on all counts as to all Defendants on December 5, 2012. [Record No. 23].

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

56(a). Further, the facts and any reasonable inferences drawn from the facts must be viewed in the light most favorable to the non-movant. Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp., 475 U.S. 574, 587-88. "However, even considering this perspective, the nonmoving party must provide more than a 'mere scintilla of evidence;' there must be sufficient evidence on which the jury could reasonably find for the nonmoving party." Frodge v. City of Newport, Civil Action No. 09-59-WOB, Record No. 34, at 6 (E.D.Ky. Dec. 29, 2010) [hereinafter "Frodge I"] (footnote omitted) (quoting Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009)), *aff'd*, No. 11-5458, 2012 U.S. App. LEXIS 20942 (6th Cir. Oct. 5, 2012).

### III. ANALYSIS

#### A. CLAIMS UNDER 42 U.S.C. § 1983

1. *Respondeat Superior Claim against the City of Pikeville*

The Defendants assert that a municipality cannot be held liable under 42 U.S.C. § 1983 based on the theory of Respondeat Superior. [Record No. 23-1, at 17-19]. Hocker concedes that the City of Pikeville is entitled to summary judgment on all counts alleged in the complaint. [Record No. 42, at 21]. With respect to Count VI alleging the City of Pikeville liable under Respondeat Superior as to Hocker's § 1983 claim, the Court agrees that summary judgment is appropriate.[2]

2. *Respondeat Superior claim against Pikeville City Police Department*

In their motion for summary judgment, the Defendants claim that Pikeville City Police Department is not a suable entity and the proper party is City of Pikeville. [Record No. 23-1, at 17]. Hocker counters that the different immunities afforded to counties versus cities under

---

[2] The Defendants argue, and Hocker agrees, that the City of Pikeville is entitled to summary judgment on all counts asserted against it. [Record Nos. 23-1, at 17-19; 42, at 21]. However, as the Court is declining to exercise jurisdiction on Hocker's state law claims, if Hocker decides to assert claims against the City of Pikeville in state court, the Court does not wish to prejudice any claims asserted and therefore reserves judgment on the merits as to all other claims for the state court.

Kentucky law render this situation distinguishable from the cases holding police departments to be non-suable entities. [Record No. 42, at 19-20]. Hocker further argues that the definition of "police force" under KENTUCKY REVISED STATUTE § 95.010(1) "in no way defines police force as the officers and policemen of the city." [Record No. 42, at 20].

Under Kentucky law, a governmental entity is a non-suable entity if the nature of the defendants and allegations, and the function of the entity indicate the claim is essentially against the county or city. Smallwood v. Jefferson County Government, 743 F.Supp. 502, 503 (W.D.Ky. 1990). If in considering the nature of the claims the entity is found to be merely an extension of the county or city, then the county or city, not the entity, is the proper party. Id.; *see also* Matthews v. Jones, 35 F.3d 1046, 1049 (6th Cir. 1994) (applying the rule in Smallwood to conclude that a county police department is not a suable entity and the proper party was the county); Frodge v. City of Newport, No. 11-5458, 2012 U.S. App. LEXIS 20942, at *14 n.3 (6th Cir. Oct. 5, 2012) [hereinafter "Frodge II"] (recognizing the District Court's application of Matthews to a *city* police department).

In a Fourth Class city such as Pikeville, Kentucky law affords the city's civil service commission significant control over their police departments, including the hiring of officers, the size of the police force, and other significant policy determinations. KY. REV. ST. §§ 81.010(4), 95.762(4), 95.764. Clearly, the city exercises significant control over the police department and the department acts as an extension of the city. Further, the § 1983 claims involved and the named Defendants indicate that the claims are effectively against the City of Pikeville.[3]

---

[3] Hocker cites to Estep v. City of Somerset in support to the conclusion that Pikeville City Police Department is a suable entity. [Record No. 42, at 20]. However, in Estep, the issue was presented in a motion to dismiss, causing the standard by which the court considered the issue to be decisively different. Estep v. City of Somerset, Civil Action No. 10-286-ART, 2010 U.S. Dist. LEXIS 135189, at *26-28 (E.D.Ky. Dec. 21, 2010) (concluding that, because all facts alleged in the complaint must be assumed true, the legal authority cited by the defendants did not mandate dismissal). As the issue is before the Court at the summary judgment stage, this situation cannot be meaningfully distinguished from Matthews and Frodge I.

7

Accordingly, Pikeville City Police Department is not a suable entity and Hocker's claims are properly asserted against the City of Pikeville. As a result, Pikeville City Police Department is entitled to summary judgment as to Count VI in the Complaint.[4]

3. *Claim against Officers Baisden and Branham in their Official Capacities*

A suit against a government official in his or her "official capacity is the equivalent of a suit against the governmental entity." Matthews v. Jones, 35 F.3d 1046, 1049 (6th Cir. 1994) (citing Will v. Michigan Dept. of State Police, 491 U.S. 58, 68 (1989)). Therefore, Hocker's § 1983 claim against Officers Baisden and Branham in their official capacities must be treated as a suit against the City of Pikeville.[5] In order to establish a § 1983 claim against a municipality,

> a plaintiff must demonstrate the deprivation of a constitutional right and that the municipality is responsible for the violation, which requires proof of a direct causal link between the policy or custom and the alleged deprivation. Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist., 455 F.3d 690, 700 (6th Cir. 2006). In fact, the policy or custom "must be the 'moving force of the constitutional violation' in order to establish the liability of a government body under § 1983." Searcy v. City of Dayton, 38 F.3d 282, 286 (6th Cir.1994).

Frodge I, at 21 (footnote omitted).

While the exact grounds asserted for official liability are unclear, affording Hocker the benefit of the doubt as the non-moving party, the Court will assume the Hocker asserts liability based on inadequate policies of the Pikeville City Police Department, and therefore the City of Pikeville, and the deficient training and supervision of the officers on the use of deadly force. To establish municipal liability under § 1983 based on a government entity's policy, the named official must have committed the unconstitutional action and "be responsible for establishing

---

[4] The Defendants argue that Pikeville City Police Department is entitled to summary judgment on all counts asserted against it. [Record No. 23-1, at 17]. However, as the Court is declining to exercise jurisdiction on Hocker's state law claims, the Court reserves judgment on the merits as to all other claims asserted against Pikeville City Police Department for the state court.

[5] As explained in section III.A.2, Pikeville City Police Department is not a suable entity and the proper party for any such allegation is the City of Pikeville. Therefore, while Officer Baisden and Branham are Pikeville City Police Officers, for the purpose of Hocker's § 1983 action, they are officers of the City of Pikeville. Accordingly, Hocker's claims against the officers in their official capacities are regarded as actions against City of Pikeville.

final government policy respecting such activity before the municipality can be held liable." Pembaur v. City of Cincinnati, 475 U.S. 469, 482-83 (1986); *see also* Feliciano v. City of Cleveland, 988 F.3d 649, 655 (6th Cir. 1993). As there is no allegation or evidence that Officer Baisden or Officer Branham had the authority to establish or change the policies of the City of Pikeville or Pikeville City Police Department, they cannot be liable under § 1983 due to the Pikeville City Police Department or City of Pikeville's policies. Additionally, municipal liability under § 1983 for inadequate training and supervision requires a plaintiff to show "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist., 455 F.3d 690, 700 (6th Cir. 2006). However, such a claim cannot be predicated on mere negligence. *See, e.g.*, Daniels v. Williams, 474 U.S. 327 (1986); Leach v. Shelby County Sherriff, 897 F.2d 1241, 1246 (6th Cir. 1989); Hays v. Jefferson, 668 F.2d 869, 872 (6th Cir. 1982). There is no claim or proof that any deficient training or supervision of the officers rose above mere negligence, which is insufficient to establish municipal liability. [*See* Record No. 1, at ¶¶ 40-44 (asserting a cause of action for *negligent* training and supervision)]. Hocker fails to allege any other proper basis for municipal liability. Accordingly, because the § 1983 claims against Officers Baisden and Branham in their official capacities under § 1983 fail as a matter of law, summary judgment is appropriate.

4. *Claim against Officers Baisden and Branham in their Individual Capacities*

The Defendants argue that Officers Baisden and Branham in their individual capacities are entitled to qualified immunity under § 1983 for their use of deadly force against Hocker as their actions were objectively reasonable. [Record No. 23-1, at 22-30]. Conversely, Hocker contends that the officers are not entitled to qualified immunity because both were out of danger

when they fired on Hocker and, therefore, the use of deadly force was unreasonable and violated Hocker's rights under the Fourth and Eighth Amendments. [Record No. 42, at 22-24]. Because the circumstances and Hocker's plea of guilty to first degree wanton endangerment are sufficient to conclude that the officers were reasonable in their use of deadly force, Officers Baisden and Branham are entitled to summary judgment in their individual capacities.

A government officer sued in their individual capacity is entitled to immunity from suit under § 1983 unless the plaintiff shows that 1) the defendant violated a clearly established constitutional or statutory right of the plaintiff, and 2) a reasonable person in the defendant's position would have known the right existed. Pearson v. Callahan, 555 U.S. 223, 231 (2009); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Further, even if the official acted in error and violated a right of the plaintiff, the official is still protected from civil liability under qualified immunity "irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact." Chappell v. City of Cleveland, 585 F.3d 901, 907 (6th Cir. 2009) (citing Pearson, 555 U.S. at 231).

> The qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 343, 341, (1986). This accommodation for reasonable error exists because "officials should not err always on the side of caution" because they fear being sued. Davis v. Scherer, 468 U.S. 183, 196 (1984).

Hunter v. Bryant, 502 U.S. 224, 229 (1991).

As an initial matter, Hocker's claim fails as a matter of law under the Eighth Amendment. "[T]he Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences." Aldini v. Johnson, 609 F.3d 858, 864 (6th Cir. 2010) (citing Whitley v. Albers, 475 U.S. 312, 318-22 (1986)). At the time of the incident on which the complaint is based, Hocker had not been

convicted or while he was serving a sentence. Therefore, Hocker cannot maintain a § 1983 claim under the Eighth Amendment as alleged in the complaint.

Under the qualified immunity analysis, when considering an alleged Fourth Amendment violation, the use of deadly force is examined for its objective reasonableness at the time of the officer's conduct. Brosseau v. Haugen, 543 U.S. 194, 197 (2004); Tennessee v. Garner, 471 U.S. 1, 7-19 (1985); *see also* Graham v. Connor, 490 U.S. 386, 395 (1989). Deciding whether the use of force in a particular case was reasonable "requires careful attention to the facts and circumstance of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396 (citing Garner, 471 U.S. at 8-9). Further, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97. The determinative concern under qualified immunity and reasonableness analyses is the perspective of the officers and their perception of events as they unfolded. Great allowance is given for unknown or misinterpreted realities of the circumstances in a rapidly evolving situation.

Even when viewed in the light most favorable to Hocker, all of the factors clearly weigh in favor of finding the officers' use of deadly force reasonable. With regard to the severity of the offense, the officers began pursuing Hocker due to the complaint that he was trying to gain entry into a residence, was highly intoxicated, and possibly suicidal. Additionally, Officer Baisden knew that Hocker was violating an emergency protective order, which alone was an arrestable offense. This would lead Officer Baisden to reasonably believe Hocker did not show regard for

11

the authority of the court or law enforcement's orders. Additionally, Hocker led the officers on a high speed chase, in an apparent attempt to evade arrest. His erratic behavior and intoxicated state created a potentially dangerous situation to all those driving in Hocker's vicinity and other individuals in his path. Hocker's offenses prior to the officers' use of deadly force were sufficiently severe to weigh in favor of finding the use of deadly force was reasonable.

Further, Hocker was attempting to evade law enforcement, evidenced by his plea of guilty to fleeing or evading police. While Hocker claims that when he pulled onto the gravel drive he did not see the flashing lights of the police cruiser and did not hear the officers' commands to get out of the vehicle, it does not necessarily contradict the officers' assertions that they did have the lights of the cruisers on and shouted at Hocker to get out of his vehicle. It is therefore assumed that the officers did use their lights and sirens and tell Hocker to exit the vehicle. *See supra*, at page 3 note 1. Moreover, even if Hocker did not know the cruisers were parked behind him and the officers had exited their vehicles, the officers were reasonable in believing that Hocker was aware of their presence and was ignoring their orders in an attempt to flee. The facts support that finding that the evasion of arrest factor weighs heavily in favor of concluding the officers' use of deadly force was reasonable.

The remaining factor, the danger Hocker posed to the officers, is the most debated by the parties. While Hocker claims that once Officer Baisden and Branham were out of the path of Hocker's vehicle and the police cruiser, they were no longer danger, Hocker's previous disregard of the officers orders and volatility of the situation show that the officers' reasonable perception of the situation justified the use of deadly force. Based on the events on which the complaint is grounded, Hocker pled guilty in Pike County Kentucky Circuit Court to two (2) counts of wanton endangerment in the first degree. Under Kentucky law, "[a] person is guilty of wanton

endangerment in the first degree when, under circumstances manifesting extreme indifference to the value of human life, he wantonly *engages in conduct which creates a substantial danger of death or serious physical injury to another person.*" KY. REV. STAT. § 508.060(1) (emphasis added). Hocker's plea of guilty establishes an admission that his conduct met the requirements to be found guilty of wanton endangerment under the law. Therefore, even viewing the facts in the light most favorable to Hocker, it must be presumed that Hocker's actions created a "substantial danger of death or serious physical injury to" Officers Baisden and Branham. Id. Even if the officers used somewhat more force than necessary to subdue Hocker, in light of the situation, the use of potentially more force than necessary does not make the officer's conduct unreasonable. *See* Griffin v. City of Heath, No. 2:04-cv-199, 2006 U.S. Dist. LEXIS 23468, at *21-22 (S.D. Ohio March 21, 2006) (finding that it was reasonable for the officers to believe that the suspect was "likely to fight back" based on his threatening conduct and therefore the use of potentially more force than was necessary was justified (citing Saucier v. Katz, 533 U.S. 194, 205 (2001))). As they were firing, the officers could not know if and how many times Hocker had been shot and if he was incapacitated, and were reasonable in acting with the assumption that he was not and posed a continuing threat.

Even if the officers were out of the direct path of the vehicles when they fired, it does not support the conclusion that the officers were out of danger. As Hocker had already rammed the police cruiser, causing its door to hit Officer Baisden, it was reasonable for the officers to believe that they were still in danger when they were out of the immediate path of the vehicle. Based on Hocker's actions, the officers reasonably could have concluded that Hocker would change directions and drive at them. Further, in the previous pursuit, Hocker had driven at a high rate of speed without his headlights on, creating a perilous situation for other drivers and pedestrians. As

13

would appear to the officers that Hocker rammed the cruiser in an attempt to flee, the officers could have reasonably believed, if Hocker had successfully made it back to the road, his driving would have created a dangerous situation to others. Any potential violation of the Pikeville City Police Department's policy is not controlling or indicative of the reasonableness of the officers' actions under the qualified immunity analysis. Consideration of the situation from the officers' perspective supports finding the use of deadly force reasonable even if the officers not directly in the path of the vehicles when they fired.

Further, while Hocker's expert may have concluded that the use of deadly force was unnecessary, it is not sufficient to overcome circumstances and the officers' perception of events as they transpired. The central issue in determining qualified immunity is events from the viewpoint and perception of the officers as the situation was unfolding. Moreover, ample allowance is afforded for mistakes in the assessment of a situation as it evolves. Hocker's expert, with the luxury of hindsight and knowledge of all the facts, which could not have been available both officers at the time, may attest that the use of deadly force was unreasonable. However, the expert's analysis does not cast a significant doubt as to the officers' perception of the events and what they concluded were necessary actions, giving the officers the proper leeway for reasonable misinterpretation of the continuing threat Hocker posed. With the officers' contemporaneous perspectives in mind, Hocker's expert does present sufficient evidence to call into question the reasonableness of the officers' actions and their entitlement to qualified immunity.

There is a factual dispute as to the officers' actions when removing Hocker from his car after it came to a stop. Diane Meade claims she witnessed the officers hitting Hocker while he was in his car immediately after the shooting incident. [Record No. 38, at 34.21-44.24]. While he doesn't remember what happened, Hocker asserts that he had bruises on his neck, including one

(1) shaped like handprint, when he woke up in the hospital after the incident. [Record No. 35, at 34.22-35.24]. Additionally, Hocker argues that he is entitled to a spoliation instruction in his favor in support of Meade's testimony due to Detective Merlo's deletion of a video taken at the scene. Contrary to Hocker's claims, Officers Baisden and Branham testified that, while they did have to forcefully pull Hocker out of his car, neither officer punched, slapped, kicked, or otherwise struck Hocker. [Record Nos. 33, at 39.19-41.6; 36, at 16 52.4-54.10].

While there is a dispute as to the officers' actions when removing Hocker from his vehicle, the officers are still entitled to qualified immunity. As a preliminary matter, Hocker would not be entitled to a spoliation instruction due to Detective Merlo's deletion of the video taken at the scene. The testimony of Detective Merlo shows that the video he deleted was recorded of the scene after the incident, while the police were conducting their investigation. [*See* Record No. 42-5]. Therefore, the video was not evidence relevant to Hocker's claims and could not have supported Meade's statement. In relation to the factual controversy, first, the dispute does not concern a material fact. Without question, the crux of Hocker's allegations is the officers' act of firing their weapons at Hocker, evidenced by Hocker's claim of the unreasonable use of *deadly* force. Second, Meade's testimony and Hocker's allegations present no more than a scintilla of evidence supporting the use of unreasonable force. Clear inaccuracies in Meade's deposition testimony and the ambiguity of whether the photos presented by Hocker even show bruises on his neck, let alone the shape of any bruises, cannot be ignored. It is clear that a reasonable jury could not rely on the evidence presented by Hocker to conclude by a preponderance of the evidence that the officers violated Hocker's Fourth Amendment rights. Third, even assuming the officers did hit Hocker, Meade's testimony does not contradict the officers' claim that Hocker was screaming and refused to let go of the steering wheel. Thus,

Meade's testimony does not support that the force used was not necessary due to Hocker's actions. Clearly, the allegation that Officers Baisden and Branham hit Hocker is not sufficient to find the officers are not entitled to qualified immunity.

Therefore, because Officers' Baisden and Branham's use of deadly force was reasonable under the circumstances, the officers should be afforded the protections of qualified immunity. Accordingly, Officers Baisden and Branham in their individual capacities are entitled to summary judgment.

### B. STATE LAW TORT CLAIMS

Hocker also asserts tort claims for assault, battery, negligent infliction of emotional distress, and negligence under Kentucky law. However, given that summary judgment has been granted on Hocker's federal claims under § 1983, the Court must decide whether it is appropriate to continue to exercise supplemental jurisdiction over the pendant state law claims. A court had discretion to decline exercising supplemental jurisdiction over pendant state law claims when the "court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). Additionally, a court may decline to exercise supplemental jurisdiction if a claim "raises a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). When all federal claims have been dismissed, the Sixth Circuit has urged that, in most circumstances, the appropriate course of action is the use of a court's discretion to decline jurisdiction and dismiss pendant state law claims. *See, e.g.,* Brown v. Cassens Transport Co., 546 F.3d 347, 365 (6th Cir. 2008) (reversed on other grounds, 675 F.3d 946 (6th Cir. 2012); Hankins v. The Gap, Inc., 84 F.3d 797, 803 (6th Cir. 1996). A court must the balance of interests of the parties, the state, and the court, including judicial economy and fairness, to determine if it is proper to elect to retain jurisdiction. *See, e.g.,*

Taylor v. First of America Bank-Wayne, 973 F.2d 1284, 1287-88 (6th Cir. 1992); Aschinger v. Columbus Showcase Co., 934 F.2d 1402, 1412 (6th Cir. 1991).

The Defendants' argument regarding whether the Kentucky Supreme Court's holding in Rigazio v. Archdiocese of Louisville applies to negligent infliction of emotional distress claims presents a novel and complex issue of state law. 853 S.W.2d 295, 299 (Ky, 1993); *see also* Record Nos. 23-1, at 33-34; 42, at 26-28. The issue has become more complex and novel due to the Kentucky Supreme Court's recent holding in Osborne v. Keeney. 2010-SC-397-SC, 2010-SC-430-DG, 2012 Ky. LEXIS 203, at *28 (Ky. Dec. 20, 2012) (to be published). While the Court recognizes that this case has been on the Court's docket for over one (1) and one (1) half years and discovery has been completed, the absence of any federal claims and the complexity and novelty of the state law issue presented compel the Court to decline jurisdiction and dismiss the pendant state law claims.

## IV. CONCLUSION

Accordingly, for the reasons stated herein, and the Court being otherwise sufficiently advised,

IT IS ORDERED AS FOLLOWS:

(1) That the Defendants' Motion for Summary Judgment [Record No. 23] is GRANTED IN PART AND DENIED IN PART. Summary judgment is GRANTED in favor of the Defendants on Count I and Count VI. [Record No. 1]. All other forms of relief requested are DENIED;

(2) That all remaining claims are DISMISSED WITHOUT PREJUDICE;

(3) The Court will enter an appropriate judgment; and

(4) This matter is STRICKEN from the active docket of this Court.

Signed February 13, 2013.



Signed By:
*Edward B. Atkins*  $\mathcal{EBA}$
United States Magistrate Judge